# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION


| | | |
|---|---|---|
| **RUSH UNIVERSITY MEDICAL CENTER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Nos. 12 C 4672 & 12 C 4673[1]** |
| **vs.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **KATHLEEN SEBELIUS, Secretary of Health** | ) | |
| **and Human Services** | ) | |
| | ) | |
| **Defendant.** | ) | |


## OPINION AND ORDER

Rush University Medical Center ("Rush") filed two complaints against Kathleen Sebelius

("the Secretary"), in her capacity as the Secretary of the United States Department of Health and

Human Services, alleging that the Secretary improperly calculated Rush's Medicare

reimbursement.[2]  Presently before the court are the parties' motions for summary judgment.  For

the following reasons, the Secretary's motion for summary judgment [dkt. 41] is granted in part

and denied in part, and Rush's motion for summary judgment [dkt. 44] is granted in part and

denied in part.

---

[1]  The matter in case number 12 C 4673 was reassigned from Judge Pallmeyer as related to case number 12 C 4672, which was already pending before the undersigned judge.  *See* N.D. Ill. L.R. 40.4; 12 C 4673, Dkt. 25.

[2]  The court has jurisdiction over this matter pursuant to 42 U.S.C. § 1395oo(f)(1).  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**BACKGROUND**

**I.      Relevant Medicare Statutes and Regulations**

Rush is a tertiary care hospital and academic medical center located in Chicago, Illinois.

It participates in the federal government's Medicare program as a provider of services.  *See*

42 U.S.C. § 1395x(u).  Medicare is a federally-funded health insurance program for the elderly

and disabled funded by the federal government.  *See* 42 U.S.C. § 1395 *et seq.*  In connection with

its treatment of Medicare beneficiaries, the Secretary reimburses Rush for those services.  The

Secretary is vested with the authority to determine the extent of reimbursable costs.

At its inception, Medicare reimbursed hospitals for the reasonable costs of inpatient

hospital services.  42 U.S.C. § 1395f(b)(1).  The reasonable cost was the cost that the hospital

actually incurred minus costs deemed "unnecessary in the efficient delivery of needed health

services." 42 U.S.C. § 1395x(v)(1)(A).  Under the reasonable cost system, hospitals were

reimbursed for the indirect costs of providing medical education.  *Id*; *see also* 48 Fed. Reg.

39,752, 39,778 (Sept. 1, 1983).  Reimbursement under this system proved too costly and, as a

result, Congress authorized the Secretary to limit reimbursements to those activities arising "in

the efficient delivery of needed health services."  *R.I. Hosp.* v. *Leavitt*, 548 F.3d 29, 39 (1st Cir.

2008) (quoting 42 U.S.C. § 1395x(v)(1)(A)).

Historically, teaching hospitals, such as Rush, incurred high indirect patient care costs,

which were the result of factors such as "increased diagnostic testing, increased numbers of

procedures prescribed, higher staffing ratios, and a more severely ill population."  H.R. Rep. No.

99-241(I) at 14 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579, 592.  The revised limits on the

reasonable cost system failed to take into account these indirect costs of teaching hospitals.  *See*

*R.I. Hosp.*, 548 F.3d at 39 (citing 45 Fed. Reg. 21, 582, 21, 584 (April 1, 1980)). In response, the Secretary created "an automatic adjustment" to calculate the indirect effects of medical education on the costs of inpatient care. *Id.* (citing 45 Fed. Reg. 41,868, 41,869 (June 20, 1980)).

In 1983, Congress revised the Medicare payment methodology by creating a "prospective payment system" ("PPS"), which largely displaced the reasonable cost system. *See* 42 U.S.C. § 1395ww(d); *Univ. of Chicago Med. Ctr.* v. *Sebelius*, 618 F.3d 739, 741 (7th Cir. 2010). To more accurately compensate the amounts incurred by teaching hospitals, Congress granted teaching hospitals additional payments to cover the direct and indirect costs of approved educational activities. *See* 42 U.S.C. § 1395ww(d)(5)(B), (h). The PPS system reimbursed hospitals according to a "federal rate per given service based on a patient's diagnosis at discharge." *Univ. of Chicago Med. Ctr.*, 618 F.3d at 741. Congress statutorily adopted the "indirect graduate medical education ("IME") adjustment," which considered "the ratio of FTE [full-time equivalent] interns and residents to beds as a variable" to measure the "effect of teaching activity on operating costs." 48 Fed. Reg. at 39,778. A hospital's IME adjustment was derived by multiplying its total PPS payment for the year by its "IME Adjustment Factor." The formula measured the level of teaching intensity at a hospital by comparing the ratio of interns and residents to patient beds. *See* 42 U.S.C. § 1395ww(d)(5)(B); 42 C.F.R. § 412.105.

The IME Adjustment Factor is determined by the following formula: IME Adjustment Factor = $c \times ((1 + r)^n - 1)$, where c is an adjustment factor established annually by Congress, r is the ratio of FTEs to beds, and n is approximately .405 (a statutorily established factor representing the effect of teaching activity on the hospital's indirect costs). *See* 42 U.S.C. § 1395ww(d)(5)(B), (d)(5)(B)(ii). An intern or resident must be in an approved medical

education program and assigned to one or two specified areas to be included in the FTE count. *See* 42 C.F.R. § 412.105(f)(1)(ii). The first area is "[t]he portion of the hospital subject to the prospective payment system" and the second is "[t]he outpatient department of the hospital." 42 C.F.R. § 412.105(f)(1)(ii)(A); (B). In general, reduction in the number of beds and/or an increase in the number of FTEs in the IME ratio results in a larger reimbursement to the Medicare provider.[3]

## II.    Procedural History

At the close of each fiscal year,[4] Rush filed a cost report with a Medicare fiscal Intermediary ("the Intermediary"). The cost report determined Rush's Medicare reimbursement. *See* 42 C.F.R. § 413.24(f). In fiscal years 1993, 1994, and 1996, Rush submitted Medicare cost reports and the Intermediary issued Notices of Program Reimbursement ("NPRs"), which identified the reimbursement amounts due to Rush for each of those fiscal years. *See* 42 C.F.R. § 405.1803.

---

[3]  In *Little Company of Mary Hospital & Health Care Centers* v. *Shalala*, the Seventh Circuit explained how the inclusion and exclusion of factors effects the IME adjustment factor:

> [I]f the hospital has fewer beds, it probably has a smaller medical staff, and hence a higher ratio of interns and residents to fully trained doctors–the teachers. The higher that ratio, the more training the fully trained doctors must do. Suppose Hospital A has 300 beds, 75 interns and residents, and 25 fully trained doctors, and Hospital B has 600 beds, 75 interns and residents, and 125 fully trained doctors (so that in both hospitals there is one doctor for every three beds). The fully trained doctors in Hospital A will have much heavier teaching loads than the fully trained doctors in B because the ratio of interns and residents to fully trained doctors is so much higher in A (3:1) than in B (3:5).

165 F.3d 1162, 1164 (7th Cir. 1999).

[4]  Rush's fiscal year, or cost reporting period, began on July 1 and ended on June 30.

4

Rush filed administrative appeals of its 1993, 1994, and 1996 NPRs before the Provider Reimbursement Review Board ("Board") contesting whether the Intermediary had accurately determined Rush's bed count, and whether the Intermediary was correct in excluding research rotations of residents participating in approved medical education programs when calculating Rush's IME adjustment. *See* 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. The Board ruled in Rush's favor on the bed count issue and against Rush regarding the resident research issue. Namely, the Board found that the following number of beds should have been excluded from Rush's bed count: 86.91 beds in FY 1993, 17.38 beds in FY 1994, and 51.01 beds in FY 1996. Specifically, the Board affirmed the Intermediary's decision to exclude the following number of interns and residents: 52 interns and residents in FY 1993; 47 interns and residents in FY 1994; and 63 interns and residents in FY 1996.

The Board concluded that the beds in controversy were taken out of service and were thus unavailable. The Board relied on testimony regarding how beds were taken out of and placed back into service, memoranda relating to closure, and room and bed master price indices. The Board concluded that it took Rush at least seventy-two hours to put the beds at issue back into service thus making them unavailable. In addition, the Board concluded that inpatient beds used to house outpatient observation patients should have been removed from the available bed count. Last, the Board concluded that the time spent by a resident not associated with patient care was excludable and thus removed residents engaged in research activities from the IME adjustment.

The Administrator[5] reviewed the Board's decision and found that the Intermediary ruled correctly on all of the disputed issues, thereby reversing the Board's decision regarding the bed count issue and affirming the Board's decision regarding exclusion of resident research activity. *See* 42 U.S.C. § 1395oo(f)(1). The Administrator found that Rush failed to provide adequate documentary and testimonial support for its position that it could not timely place beds taken out of service back in service. The Administrator noted that, in other cases where beds had been deemed unavailable, providers had supported their positions with additional evidence that Rush omitted. In addition, the Administrator concluded that without supporting documentation showing that Rush used beds for observational purposes, Rush failed to carry its burden of showing that its bed total should be lowered for the number of beds used for observational purposes. Last, the Administrator affirmed the Board's decision finding that research time of the residents not associated with patient care was properly excluded from the IME adjustment.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(e) & advisory committee notes (1963 amend.). "With cross-motions, [the court's] review of the record requires that [it] construe all inferences in favor of the party against whom the motion under consideration is made."

---

[5] The Secretary delegated her authority to administer the Medicare program to the Administrator of the Centers for Medicare & Medicaid Services ("Administrator"), which is an agency within the Department of Health and Human Services.

*O'Regan* v. *Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (internal quotation marks omitted).

The court's review of the Secretary's reimbursement decisions is governed by 42 U.S.C. § 1395oo(f)(1), which incorporates the standard of review from the Administrative Procedures Act ("APA"). *Abraham Lincoln Mem. Hosp.* v. *Sebelius*, 698 F.3d 536, 547–48 (7th Cir. 2012). Under the APA, an agency's decision may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *Fal-Meridian, Inc.* v. *U.S. Dep't of Health & Human Servs.*, 604 F.3d 445, 450 (7th Cir. 2010).

"The arbitrary or capricious standard of review is a deferential one which presumes that agency actions are valid so long as the decision is supported by a rational basis." *Pozzie* v. *U.S. Dep't of Hous. & Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995) (internal quotation marks omitted). The substantial evidence standard is satisfied "if the record contains such relevant evidence as a reasonable mind might accept adequate to support a conclusion." *White Eagle Co-Op. Ass'n* v. *Conner*, 553 F.3d 467, 475 (7th Cir. 2009) (internal quotation marks omitted). Under both the "arbitrary and capricious" and "substantial evidence" standards, the scope of review is narrow and the court cannot substitute its judgment for that of the agency. *See id.*; *Adventist GlenOaks Hosp.* v. *Sebelius*, 663 F.3d 939, 942 (7th Cir. 2011) (arbitrary and capricious "standard of review gives considerable weight to an agency's construction of a statutory scheme it administers"); *Khan* v. *Filip*, 554 F.3d 681, 690 (7th Cir. 2009) ("Under this extremely deferential standard, we will uphold the agency's decision if it is supported by

reasonable, substantial, and probative evidence on the record considered as a whole." (internal quotations marks omitted)).

When reviewing an agency's construction of a statute, the court determines (1) whether Congress "has directly spoken to the precise question at issue"; and if not, (2) whether the agency's construction is based on a "permissible construction of the statute." *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). When the construction of an administrative regulation is at issue, a court is required to defer to the agency's interpretation of the regulation where it is ambiguous. *See Christensen* v. *Harris Cnty.*, 529 U.S. 576, 588, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000). This deference is particularly warranted where "the Secretary is interpreting regulations issued pursuant to the complex and reticulated Medicare Act, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Hinsdale Hosp. Corp.* v. *Shalala*, 50 F.3d 1395, 1399 (7th Cir. 1995) (internal citation and quotation marks omitted).

## ANALYSIS

Rush raises three issues in connection with the Secretary's calculation of its IME adjustment factor: (1) whether the Secretary's calculation improperly included unavailable beds; (2) whether the Secretary's calculation improperly included observational beds; and (3) whether the Secretary's calculation improperly excluded time spent by residents on research unrelated to patient care.

# I. The Secretary's Calculation of Rush's Available Beds

Rush argues that the Secretary erred in failing to exclude unavailable beds from Rush's IME available bed count for the disputed years. For purposes of determining the number of available beds when calculating the IME adjustment factor, "the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period and dividing that number by the number of days in the cost reporting period." 42 C.F.R. § 412.105(b). Rush maintained multiple buildings on its campus that housed inpatients. The parties dispute the Secretary's exclusion of beds in Rush's Kellogg Building designated by their floor names (*e.g.*, 7 Kellogg, 9 Kellogg, 10 Kellogg).

In determining a provider's reimbursement amount, available beds are defined as:

adult or pediatric beds (exclusive of newborn bassinets, beds in excluded units, and custodial beds that are clearly identifiable) maintained for lodging inpatients. Beds used for purposes other than inpatient lodgings, beds certified as long-term and temporary beds are not counted. If some of the hospital's wings or rooms on a floor are temporarily unoccupied, the beds in these areas are counted if they can be immediately opened and occupied.

50 Fed. Reg. 35,646, 35,683 (Sept. 3, 1985). In addition, the Medicare Reimbursement Provider Manual further elucidated on the definition of what constitutes an available bed:

To be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient rooms or wards (i.e., not in corridors or temporary beds). Thus, beds in a completely or partially closed wing of the hospital are considered available only if the hospital put the beds into use when they are needed. The term 'available beds' as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service. In the absence of evidence to the contrary, beds available at any time during the entire cost reporting period are presumed to be available during the entire cost reporting period. The hospital bears the burden of proof to exclude beds from the count.

*Medicare Provider Reimbursement Manual* § 2405.3.G.[6]

## A.    Fiscal Year 1993

The following reflects the parties' dispute regarding the number of accountable beds in

FY 1993:

| Area | Rush Bed Count | Intermediary Bed Count | Difference |
|------|----------------|------------------------|------------|
| 5 Pavilion | 2 | 1.46 | 0.54 |
| 8 Kellogg | 35.19 | 41.08 | 5.89 |
| 3 Pavilion | 20 | 24 | 4 |
| 7S Atrium | 36 | 37 | 1 |
| 10 Kellogg | 30.51 | 46 | 15.49 |
| 2 Pavilion | 22.51 | 24 | 1.49 |
| 5 Kellogg | 34 | 37 | 3 |
| 9 Kellogg | 17.18 | 46[7] | 28.82 |
| 11 Kellogg | 15.89 | 44 | <u>28.11</u> |
| **Total** | | | **88.34** |

For FY 1993, the Administrator used the licensed capacity as the number of beds (*e.g.*,

forty-four) for 11 Kellogg; however, 11 Kellogg did not appear on the August 6, 1992 room and

---

[6] The Medicare Provider Reimbursement Manual is an informal reimbursement guideline, which the Supreme Court has described as "a prototypical example of an interpretive rule issued by an agency to advise the public of its construction of the statutes and rules it administers." *See Shalala* v. *Guernsey Mem'l. Hosp.*, 514 U.S. 87, 90, 99, 115 S. Ct. 1232, 131 L. Ed. 2d 106 (1995) (internal quotation marks omitted).

[7] The Administrator modified the bed count for 9 Kellogg based on the Intermediary's testimony before the Board.  The Intermediary stated during the hearing that Rush closed 9 Kellogg for renovations on December 12, 1992 thereby reducing the number of available beds from 46 by 20.79 to 25.21.

board master index.[8]  The room and board master index detailed information relative to bed availability used to bill for services rendered to patients located in such beds.  The Administrator considered the room and board master indices but noted that this information only reflected budget and utilization information.  Such information did not accurately reflect whether a bed was available under Medicare's standard.  Although useful, relying solely on room and board master indices, according to the Administrator, was an inaccurate way to count the number of available beds because they only reflected whether those rooms and beds were capable of generating a billable charge.

Availability of a bed for Medicare reimbursement is based on the immediacy by which a bed can be put into use to house an inpatient, *see* 50 Fed. Reg. at 35,683, and the Administrator properly determined that the licensed number of beds on a floor provided an accurate count of available beds.  Indeed, the available bed standard is measured by the actual number of beds that could be put into service; there may be available beds above and beyond the beds those reflected on a provider's invoice.  *Cf. Cnty. of Los Angeles* v. *Leavitt*, 521 F.3d 1073, 1078–78 (9th Cir. 2008).  The room and board indices, the Administrator determined, only presented a snapshot of a floor at a discrete point in time and were not indicative of whether beds were unavailable over the entirety of Rush's fiscal year.  The Administrator thus did not err in using the number of licensed beds when calculating the number of available beds.  *See Cnty. of Los Angeles*, 521 F.3d at 1078–79.

---

[8]  As detailed *infra* in §§ I.A, I.B, and I.C, the Administrator disallowed beds in other buildings on Rush's campus.  The parties here focus their arguments on beds in the Kellogg building as representative of the Secretary's methodology to determine whether the disputed beds in all buildings were unavailable.  Rush challenges the Secretary's decision to include all beds as available.  In support of its argument, it references specific floors from the Kellogg building as indicative of the Secretary's universal error.

Moreover, the burden is on providers, such as Rush, to exclude beds from the IME adjustment count as unavailable. *See Medicare Provider Reimbursement Manual* § 2405.3.G ("The hospital bears the burden of proof to exclude beds from the count."); *Clark Reg. Med. Ctr.* v. *U.S. Dep't of Health & Human Servs.*, 314 F.3d 241, 247 (6th Cir. 2002) (same); 42 C.F.R. § 413.20; 42 C.F.R. § 413.24(a). The Secretary concluded that Rush failed to provide sufficient evidence warranting exclusion of all forty-four beds on 11 Kellogg during FY 1993. She rejected Rush's argument that the omission of beds from a master room and board index translated into unavailability. As it was Rush's burden to provide this information, the Secretary's decision to include beds as available despite the fact that they did not appear on the master price index was not error.

**B.      Fiscal Year 1994**

The following reflects the parties' dispute regarding the number of accountable beds in FY 1994:

| Area | Rush Bed Count | Intermediary Bed Count | Difference |
|------|----------------|------------------------|------------|
| 3 Pavilion | 19.85 | 20 | 0.15 |
| 5 Kellogg | 19.76 | 24 | 4.24 |
| 7 Kellogg | 23.56 | 25 | 1.44 |
| 9 Kellogg | 27.80 | 40 | 12.20 |
| 11 Kellogg | 32.19 | 35 | <u>2.8</u> |
| **Total** | | | **20.84** |

During fiscal year 1994, between July 1993 and February 1994, the number of physical beds on 9 Kellogg grew to forty, which was the licensed capacity. Beginning in FY 1993 and

continuing until FY 1994, 9 Kellogg was under construction, and on September 17, 1993, Rush reopened the floor and put twenty eight beds into service. Over the course of FY 1994, Rush added an additional twelve beds to 9 Kellogg. The Administrator used the forty beds for the entirety of that year because it considered all forty beds to be available while Rush argues that only the beds in actual service should have been counted. The Administrator determined that although Rush initially placed twenty eight beds into service, it could have added those twelve additional beds at any time thus making them available for purposes of the IME adjustment.

The Administrator's conclusion is in accord with the definition of an available bed because the deciding factor is not whether the beds were actually in service but whether they could be placed into service in a short period of time. *See* 50 Fed. Reg. at 35,683 ("If some of the hospital's wings or rooms on a floor are temporarily unoccupied, the beds in these areas are counted if they can be immediately opened and occupied."); *See*, *e.g.*, Blue Cross and Blue Shield Association issued Administrative Bulletin 1841, 88.01, November 18, 1988[9] ("In a situation where rooms or floors are temporarily unoccupied, the beds in these areas must be counted, provided the area in which the beds are contained is included in the hospital's depreciable plant assets, and the beds can be adequately covered by either employed nurse or nurses from a nurse registry . . .Where a room is temporarily used for a purpose other than housing patients (e.g., doctors' sleeping quarters), the beds in the room must be counted,

---

[9] In connection with its role as a fiscal intermediary, Blue Cross and Blue Shield reproduced the agency's policy when issuing the Administrative Bulletin. *See Altoona Hosp.* v. *Thompson*, 131 F. App'x 355, 358 (3d Cir. 2005) (citing 69 Fed. Reg. 48916, 49092 n.6).

provided they are available for inpatient use on an as needed basis.").[10]  In addition, the available

bed count takes the entire fiscal year into account when determining available beds.  *See*

*Medicare Provider Reimbursement Manual*, § 2405.3.G ("In the absence of evidence to the

contrary, beds available at any time during the entire cost reporting period are presumed to be

available during the entire cost reporting period.").  The evidence supported the Secretary's

decision that all forty beds on 9 Kellogg were available for the entire year as Rush eventually

placed all forty beds into service during FY 1994.

Rush also argued before the Board that it leased beds on other disputed floors and could

not place those beds in service within seventy-two hours making them unavailable.  *See*, *e.g.*,

Blue Cross and Blue Shield Association issued Administrative Bulletin 1841, 88.01, November

18, 1988 ("[B]eds are considered 'available' and must be counted even though it may take 24-48

hours to get nurses on duty from the registry.").  The Administrator rejected Rush's position that

the seventy-two hour window in returning a bed to service was determinative and noted that

providers that had prevailed on this argument before the Administrator had submitted additional

documentation (which Rush did not) substantiating their position.  Among the types of evidence

lacking in Rush's submission were "contracts (i.e., staffing, equipment) that showed the

contractual lead time necessary to obtain sufficient staffing, equipment, etc., to place the beds in

service, or evidence that the beds/room/unit had been permanently converted to a non-inpatient

---

[10]  The Blue Cross and Blue Shield Association issued an Administrative Bulletin providing that "[a] wing is considered permanently closed if the area in which the beds are contained is not included in a hospital's depreciable plant assets subject to capital-related cost reimbursement during a cost reporting period, and no available bed days for those beds should be counted."  Blue Cross and Blue Shield Association issued Administrative Bulletin 1841, 88.01, November 18, 1988.  Rush did not cite evidence in its briefing from the record indicating that it excluded the floors at issue from its depreciable plant assets that were subject to capital-related cost reimbursement.

use and oxygen, nurse call stations, etc., had been removed making it impossible to place a bed in service in that time frame." Case No. 12-cv-4672, Dkt. 1–2 at 17.

In addition to being unsubstantiated, Rush's evidence, the Administrator found, was contradictory in that some evidence submitted by Rush demonstrated that it could return a bed to service the same day.[11] The Administrator concluded that "regardless of whether, as a matter of policy, a 72 hour delay in placing a bed in service is sufficient to make the bed unavailable, [Rush's] own documentation indicates that beds in otherwise occupied areas, were able to be immediately placed in service upon request." *Id*. The Administrator relied on specific examples from documents submitted by Rush showing that beds were placed back in service on the same dates of requests. *See* Case No. 12 C 4672, Dkt. 1–2 at 17. Because Rush's evidentiary support to exclude beds was incomplete and contradictory, the Administrator's decision to include beds that could be placed into service in a short period of time was rational considering the evidence presented. *See*, *e.g.*, *Mt. Sinai Hosp. Med. Ctr.* v. *Shalala*, 196 F.3d 703, 709 (7th Cir. 1999)

---

[11] The Administrator found the following inconsistencies:

The record shows at least four memorandums requesting to have beds placed in service and that such beds were placed in service the same dates of the requests. Reviewing Provider Exhibit P-16, for the FY 1993 cost year, the record shows for 8 Kellogg, a January 8, 1993 memorandum requesting six beds be opened (two of which indicated as 'already there') and the Provider showing in the summary of the beds in dispute, dates of service 1/08/1993-01/12/1993; a January 12, 1993 memorandum requesting that two beds (indicated as already there in [the] January 8 memorandum as Rooms 815 A and 833B) be opened 'in the computer' system and showing dates of service 1/12/93-3/1/1993); and a March 17, 1993 memorandum showing a request to open 5 beds, showing dates of service of 3/17/1993-06/30/1993. For the FY 1994 cost year, Provider Exhibit P-11, shows a June 15, 1995 memorandum requesting that 4 beds in 3 Pavilion be placed back into service, which the Provider then indicates were put back into service that day as reflected in its summary of beds in dispute at P-11, with dates of service 6/15/1995-6/30/1995.

12-cv-4672, Dkt. 1–2 at 17.

(substantial evidence standard requires examining whether "there [is] a rational relationship between the facts as the [Secretary] finds them and [her] ultimate conclusion"). Rush thus failed to carry its burden on this point to show that the beds at issue should be excluded.

C.     **Fiscal Year 1996**

The following reflects the parties' dispute regarding the number of accountable beds in FY 1996:

| Area | Rush Bed Count | Intermediary Bed Count | Difference |
|------|----------------|------------------------|------------|
| 11 Kellogg | 17.59 | 20 | 2.57 |
| 5 Kellogg | 2.54 | 21.58 | 19.13 |
| 10 Kellogg | 4.42 | 25.67 | 21.25 |
| 7 Kellogg | 21.24 | 31.00 | <u>9.76</u> |
| **Total** | | | **52.71** |

For fiscal year 1996, Rush argues that the Administrator improperly counted beds in areas of the hospital that were under construction. Rush vacated 10 Kellogg on September 1, 1995 and official construction began on February 1, 1996. Beginning on September 1, 1995, beds were removed from 10 Kellogg, oxygen was turned off, supplies were taken out, nurses were redeployed, and the floor was emptied of all materials used to care for patients. In addition, the room and board indices dated November 15, 1995 and February 6, 1996 did not list 10 Kellogg. Rush relied on Karen Williams, Director of Finance Reimbursement, who submitted an affidavit stating that once a floor is closed all available are beds are removed from those units. Case 12-cv-4673, Dkt. 21-5, AR 677. The only way to add beds would be to contact a bed leasing company and place an order for additional beds. *Id*. According to Williams, it would take many

days for a vacated unit to be made available again for patient care.  *Id*. at 677–78.  Vacating a floor in this manner, argues Rush, rendered the beds unsuitable for inpatient use thus making the beds unavailable.

The Administrator did not dispute that beds in a floor under construction would necessarily be excluded.  The Administrator, however, noted that 10 Kellogg was vacated five months prior to the construction's commencement.  Although the floor was vacant, the Administrator concluded that Rush failed to show that beds at issue could not be placed back into service before construction commenced.  Moreover, the Administrator further found that Williams did not have personal knowledge with regard to the construction on 10 Kellogg and testified that she was unable to locate records supporting the process she described as having been likely.  Rush's evidentiary support, concluded the Administrator, only reflected budget and utilization concerns and did not accurately reflect whether beds in those units could be placed back into service or whether the floors had been permanently closed.

Rush's argument that floors vacated due to impending construction could not have available beds has some merit at face value.  The Administrator, however, considered this argument and found that evidence regarding the removal of equipment from a floor prior to construction was relevant but not determinative in deciding whether beds on the floor were still available.  Rush had the burden to bridge the evidentiary gap by showing that these beds in vacated floors were unavailable, which it failed to do.  As there was a time lapse between the floors being vacated and the actual commencement of construction, the Administrator determined that the beds could still be used and were thus available.  The Secretary's decision to include these beds as available was thus appropriate in light of the evidence presented and will

not be disturbed. *Abraham Lincoln Mem. Hosp.*, 698 F.3d at 550 ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *Adventist Living Ctrs., Inc.* v. *Bowen*, 881 F.2d 1417, 1420–21 (7th Cir. 1989) ("The Secretary's interpretation of regulations issued pursuant to the complex and reticulated Medicare Act is entitled to considerable deference. The fact that the [Board] and the Secretary may have reached different conclusions does not diminish the deference due Secretary's final decision; [f]inal responsibility for rendering decisions rests with the agency itself, not with subordinate hearing officers." (internal quotation marks and citations omitted)).[12]

## II.     The Secretary's Calculation of Rush's Observation Beds

Rush also argues that the Secretary improperly included beds used for observational purposes when calculating the IME adjustment. The parties agree that in calculating the IME adjustment, the bed count should be reduced for those days that beds were unavailable for inpatient use because they were occupied for observational purposes. *See* 68 Fed. Reg. 45,346, 45,418 (Aug. 1, 2003). Rush has the burden to establish that beds were observation beds such that they should be excluded from the IME adjustment count. *See* 42 C.F.R. §§ 413.20, 413.24(a).

"Observation services are those services furnished by a hospital on the hospital's premises that include use of a bed and periodic monitoring by a hospital's nursing or other staff

---

[12] Rush also argues that the Secretary ignored the Intermediary's testimony before the Board that some of the beds at issue were unavailable. The Secretary's findings are in large part consistent with the Intermediary, and in any event, the Intermediary's interpretations are not binding on the Secretary. *See Cnty. of Los Angeles*, 521 F.3d at 1079 ("While a fiscal intermediary is the Secretary's agent for purposes of reviewing cost reports and making final determinations with respect to the total reimbursement due to a provider absent an appeal to the [Board], intermediary interpretations are not binding on the Secretary, who alone makes policy.").

in order to evaluate an outpatient's condition or to determine the need for a possible admission to the hospital as an inpatient." 68 Fed. Reg. at 45,418. "When a hospital places a patient under observation but has not formally admitted him or her as an inpatient, the patient initially is treated as an outpatient." *Id*. "Consequently, the observation bed days are not recognized under PPS as part of the inpatient operating costs of the hospital." *Id*. "Observation services may be provided in a distinct observation bed area, but they may also be provided in a routine inpatient care unit or ward." *Id*. "In either case, our policy is the bed days attributable to the beds used for observation services are excluded from the counts of available beds and patient days[.]" *Id*.

Providers such as Rush submit data reporting the number of days beds were occupied by patients for observation status in Medicare cost reports. A number of years after filing its cost reports for the fiscal years at issue, Rush determined that it had overstated its observation day counts for billing purposes and sought to pay a refund.[13] Rush determined that observation charges were inadvertently billed for time spent by patients recovering from surgery in observation beds. Normal recovery time by patients immediately post-surgery was not billed as observational time. 12 C 4673, Dkt. 22–5, AR 939. This time was billable only after the normal recovery period had passed and the patient required further care. *Id*. To be clear, the observation services were rendered, but Rush did not have the proper documentation to bill Medicare for these costs. Case 12 C 4672, Dkt. 25–8, AR 1537.

---

[13] The billing error occurred in connection with physician orders that failed to specifically authorize the additional observation time spent by patients recovering from a surgical procedure. Without those orders, Rush could not bill this time as observation time. *See* Dkt. 12 C 6286, Dkt. 21–5, AR 677–78. The use of inpatient units for observation of patients recovering from surgery was due to the fact that there was a lack of recovery rooms. *Id*.

In connection with Rush's self-disclosure of its billing error, the Intermediary disallowed Rush's characterization of observation beds from FY 1993 and FY 1994 because Rush could not support its claim with contemporaneous documentation. For FY 1996, the Intermediary readjusted the observation bed day to fifty-three, down from the originally reported 3,026 observation beds. The Intermediary credited Rush with only fifty-three observation beds because Rush failed to provide adequate documentation supporting its position that the total number of beds were used for observational purposes. The Board, however, found that Rush had placed outpatients in inpatient beds for observational purposes. The Board agreed with Rush that the total hours that outpatients spent in those beds for observational purposes was excludable.

In reversing the Board's decision, the Administrator agreed with the Intermediary's finding that Rush failed to provide the appropriate documentation detailing whether the beds it claimed as observation beds were actually used for observational purposes on the dates in question. In addition, according to the Administrator, the days it claimed as observation days on paperwork submitted in connection with its cost reports did not reflect observation days. The Administrator concluded "[w]ithout supporting documentation that the days at issue were in observation days (i.e., successfully billed as such) the Provider has not demonstrated that the patient days in question are actually observation days." 12-cv-4672, Dkt. 1–2, at 19; 12-cv-4673, Dkt. 1–2, at 17.

Rush argues that the Administrator's decision to disregard time spent by patients in observation beds based on its failure to properly account for this time is improper and that Medicare does not require the specific information requested by the Secretary. Rush contends that an unbillable bed for outpatient services can still be considered unavailable for the IME

adjustment. Rush, however, had the burden to provide information showing that these disputed

beds should not be counted because they were used for observational purposes. Rush's citations

to the administrative record in support of its argument do not conclusively demonstrate that the

beds in question were used as observational beds. Therefore, the Secretary's decision to reject

beds Rush claimed were used for observational purposes was not arbitrary and capricious nor

was it against substantial evidence.

## III.    The Secretary's Exclusion of Residents and Interns Engaged In Research Activities

The third issue centers on whether the Secretary properly excluded from the IME

adjustment time spent by residents conducting research that was unrelated to patient care. The

issue boils down to whether the Secretary correctly interpreted the statutory scheme regarding

reimbursable resident activities unrelated to patient care. *See* 42 U.S.C. § 1395ww(d)(5)(B);

42 C.F.R. § 412.105(f)(1).[14]

### A.    The Statutory Scheme and Regulation

The IME adjustment formula (c x $((1 + r)^n - 1)$ does not specify the types of FTE (*i.e.*,

resident) activities that are included in the calculation as reimbursable. *See* 42 U.S.C.

§ 1395ww(d)(5)(B), (d)(5)(B)(ii). Rather, the Secretary promulgated 42 C.F.R. § 412.105, which

delineates reimbursable activities. The 1996 version of the regulation required that a resident be

enrolled in an approved teaching program and assigned "to the portion of the hospital subject to

the prospective payment system [or] in the outpatient department of the hospital." *See* 42 C.F.R.

§ 412.105(f)(1)(ii)(A), (B).

---

[14] During the time periods at issue here, the relevant regulation was codified under subsection
(g) of 42 C.F.R. § 412.105. The relevant subsection was later moved to 42 C.F.R. § 412.105(f)(1) and
some sections were renumbered. The court will refer to the present codification of the regulation.

In 2001, the Secretary amended the regulation excluding from the FTE count for "a portion of the hospital subject to the [PPS] and the "outpatient department . . . time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient." *See* 42 C.F.R. § 412.105(f)(1)(ii), (iii)(B).  In 2010, Congress amended the relevant statute, 42 U.S.C. § 1395ww(d)(5)(B), when passing the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148 § 5505.

Under the PPACA, for the years between 1983 and 2001, the IME FTE count included "all the time spent by an intern or resident in an approved medical residency training program in non-patient care activities, such as didactic conferences and seminars, *as such time and activities are defined by the Secretary*, that occurs in the hospital."  PPACA § 5505(b), (c)(1) (emphasis added).  For periods after October 1, 2001, the PPACA provided that "all the time spent by an intern or resident in an approved medical resident training program in research activities that are not associated with the treatment or diagnosis of a particular patient . . . shall not be counted." PPACA § 5505(b), (c)(3).  Congress stated that its exclusion of non-patient care research from the IME adjustment only applied to cost periods after October 1, 2001, but that this provision "shall not give rise to any inference as to how the law in effect prior to such date should be interpreted."  PPACA § 5505(c)(3).  For periods of time beginning after July 1, 2009, the PPACA provided that the DME adjustment[15] included costs for resident time in non-provider settings (*i.e.*, nursing homes and clinics) at "didactic conferences and seminars" but "not

---

[15] Although not at issue here, Medicare also reimburses teaching hospitals for direct expenses based on an FTE count.  Direct graduate medical education ("DME") costs are easily quantifiable expenses, such as a resident's salary and fringe benefits.  *See* 42 U.S.C. § 1395ww(h); *Univ. of Chicago Med. Ctr.*, 618 F.3d at 741 n.1.

including research not associated with the treatment or diagnosis of a particular patient."

PPACA § 5505(a), (c)(2).

In response to the PPACA, the Secretary promulgated a final rule on November 24, 2010 stating that the time spent by residents conducting pure research was not included as a compensable non-patient care activity. 75 Fed. Reg. 71,800, 72,146, 72,261 (Nov. 24, 2010).[16] The regulation provided, "[W]e are exercising our authority to define the term 'nonpatient care activities,' as used in section 5505(b) of the [PPACA], to adopt proposed § 412.105(f)(1)(iii)(C), which excludes research activities not related to the treatment or diagnosis of a particular patient from the category of allowable 'nonpatient care activities.'" *Id*. at 72,145.

### B.     Whether A *Chevron* Analysis Is Appropriate

The issue before the court – the Secretary's interpretation of the PPACA – would seemingly implicate the two-step analysis espoused by the Supreme Court in *Chevron*. Normally, in a *Chevron* analysis, the court first looks to whether the statute at issue is ambiguous, and if so, next determines whether an agency's interpretation of the statute was reasonable while giving deference to the interpretation. *See Chevron*, 467 U.S. at 842–43. The

---

[16]   The Secretary's promulgation was codified at 42 C.F.R. § 412.105(f)(1)(iii)(C):

Effective for cost reporting periods beginning on or after January 1, 1983, except for research activities described in paragraph (f)(1)(iii)(B) of this section, the time a resident is training in an approved medical residency program in a hospital setting, as described in paragraphs (f)(1)(ii)(A) through (f)(1)(ii)(D) of this section, must be spent in either patient care activities, as defined in § 413.75(b) of this subchapter, or in nonpatient care activities, such as didactic conferences and seminars, to be counted. This provision may not be applied in a manner that would require the reopening of settled cost reports, except those cost reports on which, as of March 23, 2010, there is a jurisdictionally proper appeal pending on direct GME or IME payments.

42 C.F.R. § 412.105(f)(1)(iii)(C).

Seventh Circuit, however, already determined that the clear meaning of the PPACA included

pure research as a reimbursable non-patient care activity prior to 2001. *See Univ. of Chicago

Med. Ctr.,* 618 F.3d at 745.

In *University of Chicago Medical Center*, the Seventh Circuit held that the Secretary

should have included pure research time when calculating the hospital's IME adjustment based

on the language of the PPACA. *Id*. at 745. The Seventh Circuit reasoned that research activities,

in "ordinary parlance," were a subset of non-patient care activities, and that section 5505(a)'s

listing of didactic conferences and seminars while excluding research activities buttressed its

conclusion that section 5505(b) (which did not mention research) warranted a finding that pure

research time was compensable as an indirect cost. *Id*. The Seventh Circuit rejected the

Secretary's argument that the no-inferences clause in section 5505(b) reflected Congress's intent

to have courts decide what activities were compensable as non-patient care activities prior to

2001; the Seventh Circuit determined that Congress "spoke clearly" when passing the PPACA.

*Id*.

The Seventh Circuit, however, issued this decision before the Secretary promulgated her

rule in response to the PPACA, which excluded research from compensable non-patient care

activities. In *Henry Ford Health System* v. *Department of Health and Human Services*, 654 F.3d

660 (6th Cir. 2011), the Sixth Circuit addressed this issue with the benefit of the Secretary's

directive. The Sixth Circuit reasoned that the text of the PPACA was not self-defining and did

not elucidate whether research constitutes a reimbursable non-patient care activity. *Id*. at 664.

Nor did Congress's juxtaposition of research with didactic conferences and seminars definitively

resolve whether all three activities fell under the reimbursable non-patient care activity umbrella.

*Id*. at 664–65.  The Sixth Circuit noted that section 5505(b) specifically delegated to the

Secretary the authority to "'define[]' eligible 'non-patient care activities," which was precisely

what the Secretary did in response when excluding research from the types of reimbursable non-

patient care activities.  *Id*. at 665 (quoting PPACA § 5505(b)).

The Sixth Circuit recognized that its decision was contrary to the Seventh Circuit's

reading of the PPACA.  The Sixth Circuit explained that the Seventh Circuit operated without

the benefit of the Secretary's promulgation:

> *University of Chicago Medical Center* v. *Sebelius*, 618 F.3d 739 (7th Cir. 2010), we
> realize is in some tension with this decision.  But we have a benefit that the Seventh
> Circuit did not–the Secretary's new regulation, which converted a run-of-the-mine
> statutory interpretation into a *Chevron* case.  No doubt the Seventh Circuit thought
> the better reading of § 5505(b) favored the hospital.  But the decision does not
> indicate what the court would have done had the validity of the regulation been
> presented to it.

*Henry Ford Health Sys.*, 654 F.3d at 666.

Although Congress delegated to the Secretary in the PPACA the responsibility of

defining reimbursable activities unrelated to patient care*,* prior to the Secretary issuing the

regulation indicating that research time was not a reimbursable non-patient care activity between

1983 and 2001, the Seventh Circuit found that Congress clearly intended that section 5505(b)

permitted reimbursement for research activity unrelated to patient care for the period between

1983 and 2001.  *See Univ. of Chicago Med. Ctr.*, 618 F.3d at 745 ("Congress spoke clearly when

it retroactively allowed reimbursement for non-patient care activities starting in 1983.").  This

court is bound by the Seventh Circuit's reading of the PPACA even though it is inconsistent with

the Secretary's later issued promulgation.  *See Nat'l Cable & Telecommunications* v. *Brand X

Internet Servs.*, 545 U.S. 967, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005) ("A court's prior

judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and leaves no room for agency discretion."); *Reiser* v. *Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004). Under current Seventh Circuit precedent, the Secretary improperly excluded research time from the IME adjustment for FYs 1993, 1994, and 1996. Accordingly, Rush's motion for summary on this point is granted.

## CONCLUSION

For the foregoing reasons, the Secretary's motion for summary judgment [dkt. 41] is granted in part and denied in part, and Rush's motion for summary judgment [dkt. 44] is granted in part and denied in part. The Secretary properly included beds as available and for observational purposes in calculating Rush's IME adjustment for the fiscal years at issue. The Secretary improperly excluded research time from Rush's IME resident count for the fiscal years at issue.

Dated: August 15, 2013                                   ENTER:

*Joan H. Lefkow*
_____
JOAN HUMPHREY LEFKOW
United States District Judge